BRADLEY *et al. v.* THE JOHN PRIDGEON, JR.

*(District Court, N. D. Illinois. March 18, 1889.)*

1. COLLISION—BETWEEN STEAMERS—FOG.

The steamer C., while steering north by east, in a fog, was struck by the steamer P. on her port bow, and sunk. The testimony on the part of the C. was to the effect that the whistle of the P. was first heard on the port bow of the C.; that the wheel of the C. was at once ported a quarter of a point, and one blast of her whistle blown, to indicate that she would pass the P. port to port; that, soon afterwards, the P.'s bright light and green light being still on her port bow, her wheel was put hard a-port, and she was swung several

points to starboard, when she was struck. The testimony on the part of the P. was that while steering south half west the white light of the C. was seen about one and one-half points off the starboard bow of the P.; that two blasts of the steam-whistle were immediately blown, and, no answer being heard, the signal was repeated; and that then one blast of a whistle being heard close at hand the P.'s wheel was put hard a-starboard, and signals given to stop and reverse; but that there was not time to reverse. The testimony that the P. was on the port bow of the C. when the latter's whistle was blown was corroborated by the testimony of those on board a schooner in tow of the C. The captain of the P. testified to the course of the vessel, but he had not seen the compass. He also testified that, when he first saw the white light of the C., he did not know it was that of a steamer. *Held,* that the officers of the P. were negligent in not stopping when they first saw the white light of the C., and in starboarding, instead of porting.

2. SAME.

Where the C. had two men of experience stationed as lookouts in the "eyes of the ship," there was a sufficient compliance with its duty as to lookouts.

3. SAME.

The C. was held not to be negligent in not blowing fog-signals at proper intervals where the testimony of those on board the C. was that fog-signals were sounded at intervals of a minute or a minute and a half from the time the fog commenced; such testimony being corroborated by those on board schooners in the vicinity, and the only evidence to the contrary being the fact that they were not heard on board the P. until after the lights of the C. were seen.

4. SAME.

A speed of five miles an hour, in a fog, with some sea and wind, was held not to show negligence.

In Admiralty.

*H. D. Goulder* and *Will. B. Moak,* for libelants.

*Schuyler & Kremer,* for claimant.

BLODGETT, J. On the evening of October 13, 1886, there was a collision on the waters of Lake Michigan, a short distance off the port of Sheboygan, between the steam-propeller John Pridgeon, Jr., and the steam-propeller Selah Chamberlain, which resulted in the sinking and total loss of the Chamberlain; and by this suit libelants, as owners of the Chamberlain, seek to recover the damages sustained by them from the loss of their steamer. The material allegations of the libel are that the Chamberlain, bound on a voyage from Milwaukee to Escanaba, left Milwaukee with the schooner Fayette Brown in tow, and proceeded on her course near the west shore of the lake, and that at about 7 o'clock in the evening the weather became thick and foggy; that thereupon the speed of the steamer and tow was reduced, extra lookouts placed in the bow in the best position for keeping a lookout, and a strict, constant, and vigilant lookout kept, and three proper fog-signals of three blasts from the steam-whistle of the steamer blown at regular and proper intervals, and thereafter, and up to the time of the collision, the ship and her tow were navigated at a moderate speed, and with due care, skill, and caution; that while so proceeding, and at about 30 minutes past 8 o'clock on the evening of said day, a single blast of a steam-whistle was heard bearing off the port bow of the Chamberlain, which proved to be from the steamer John Pridgeon, Jr. bound south, or up the lake; that the Chamberlain responded immediately with one blast, ported her

wheel, and blew three blasts, as a signal to indicate a tow, when the Pridgeon's lights were made coming on the port bow of the Chamberlain; whereupon the Chamberlain put her wheel hard to port and blew a single blast, and thereupon the Pridgeon blew two blasts, and struck the port bow of the Chamberlain, cutting into her hull a distance of 10 feet or more, and so injured the Chamberlain that she soon sank and became a total loss; and that the collision was caused solely by the fault, negligence, and want of skill of those navigating the Pridgeon. The answer of the Ogdensburg & Lake Champlain Railroad Company, the claimant of the Pridgeon, admits the collision between the two steamers, and the sinking of the Chamberlain, but denies all negligence and unskillfulness on the part of those navigating the Pridgeon; and alleges that for some time before and at the time of the collision it was dark, rainy, and densely foggy. That the wind was blowing a fresh breeze from the southward and eastward, making a sea from that direction, and that the Pridgeon had been from early in the evening until shortly before the collision steering south by west. That her lights were properly placed and burning brightly. That her speed had been checked, so that at the time of the collision she was running at a speed not to exceed four miles per hour, which was not more than enough to give her steerage way. That the master was officer of the deck, stationed forward of the pilot-house, within easy reach of the signals to the engineer. That the fog-whistle was being regularly and loudly blown at intervals of not less than a minute, by the second mate, standing close to the master. That a competent and vigilant lookout was posted forward, in the extreme bow, on the upper deck, and a competent seaman in charge of the wheel. That while slowly steering along in this way, and when at a point some miles to the northward of Sheboygan, Wis., two blasts of a fog-horn from a schooner were heard over the starboard bow of the steamer, evidently heading westerly, and to give ample room the steamer's wheel was put to starboard a point, and there steadied. That about this time a white light, about one and one-half points off the starboard bow of the steamer, was reported. That two blasts of the steam-whistle were immediately blown, and, no answer being heard, the signal was repeated, there being scarcely any interval between the signals. That to the last signal an answer by one blast of the whistle was heard, and, this being very close, the Pridgeon was immediately stopped and backed, but in a few minutes after this the Chamberlain hove in sight directly ahead, and under the Pridgeon's bow, whereupon the steamers collided, the Chamberlain being struck on her port bow, and cut down to the water line. That the persons in charge of the Chamberlain were guilty of negligence, want of skill, and fault as follows: (1) In not having a competent and vigilant lookout; (2) in not blowing the proper fog-signals at proper intervals; (3) in running at too great a rate of speed; (4) in not answering the passing signals of the Pridgeon; (5) in porting, instead of starboarding, her wheel. And, further, that libelant has instituted proceedings in this court for limitation of its liability, as owner *pro hac vice* of the Pridgeon, for the damages occasioned by said collision, which pro-

ceedings are still pending. The proof, as is usual in this class of cases, is conflicting and contradictory. All agree, however, that the night was foggy, that the wind was about S. S. E., and that at intervals during the afternoon and evening, up to about an hour before the collision, it had been blowing in strong gusts, with rain; but I think the weight of evidence is that at the time of the collision, and for an hour or more before, there had been but little wind, not enough to fill the sails of the Chamberlain, or those of her tow.

The chief difficulty lies in determining from the proof the respective courses of the two steamers at the time each became aware of the proximity of the other. The wheelsman of the Chamberlain states that from the time he took the wheel, which was a little after 6 o'clock in the evening, her course had been N. by E., excepting that he altered the course a little about half past 7, to clear a schooner, and then resumed the course, while the wheelsman of the Pridgeon states that her general course during the evening was S. by W., but that just before the collision he had starboarded a half point to clear a schooner, whose two blasts of a fog-horn were heard over her starboard bow, and steadied, which would bring her course S. ½ W. And it may be here remarked that these seem to have been the proper and natural courses for these steamers to pursue, in view of their respective destinations, and that these courses would bring them in such relations that they might pass each other on nearly parallel lines, or meet end on. As was appropriately said by Judge Brown in the case of *The Lepanto*, 21 Fed. Rep. 651:

"The basis of cases of this character is some fault in the person or persons sued. Fault consists in the violation of some statutory rule of navigation or in the failure to exercise due nautical skill or prudence. The preponderance of proof is upon the libelants. To entitle them to recover they must point out the fault complained of, and establish it by fair preponderance of evidence."

The chief faults insisted on by libelants against those in charge of the Pridgeon are: (1) That the Pridgeon was going at too high a rate of speed; (2) that, on discovering the Chamberlain's lights, the Pridgeon should have been stopped, or stopped and backed; (3) that, on discovering the Chamberlain's lights, the Pridgeon's wheel was put to starboard, when it ought to have been put to port. To my mind the weight of evidence quite satisfactorily shows that the Pridgeon was on the port bow of the Chamberlain when those in charge of the Chamberlain first became aware that the Pridgeon was near them. The testimony of the master, wheelsman, and two lookouts of the Chamberlain all agrees that the first notice they had of the Pridgeon's presence was by hearing a single blast of her whistle on the Chamberlain's port bow, the different witnesses placing the angle from one to three points over that bow; and this testimony from the deck of the Chamberlain is corroborated by the testimony of the master, wheelsman, and lookout of the Brown,—the schooner in tow of the Chamberlain. Besides, the way the vessels came together, also, in my estimation, supports the same conclusion. It is

true, the master, wheelsman, and lookout of the Pridgeon say they first discovered the Chamberlain's light over their starboard bow, and inferred that the steamer bearing those lights was to the starboard of them, and this could not have been correct if the two steamers were at that time both standing on their alleged respective courses,—that is, the Chamberlain going N. by E., and the Pridgeon S.½ W.,—unless the course of the Pridgeon was to the east of the course of the Chamberlain, in which case the signal of the Pridgeon would have been heard over the Chamberlain's starboard bow. It will be borne in mind that those on the deck of the Pridgeon, who testify to the direction in which the Chamberlain's lights bore, all say that up to the time they first saw those lights they had heard no whistle from the Chamberlain; while the testimony from the decks of the Chamberlain and Brown is that the first thing they heard was a strong, clear blast from the Pridgeon's whistle on their port bow; the wheel of the Chamberlain was at once ported a quarter of a point, and one blast of her whistle blown, to indicate that she would pass the Pridgeon port to port; that soon after this was done they saw the Pridgeon's bright light and green light still on their port bow, and then they put their wheel hard a-port, and the Chamberlain began to swing to starboard, and had swung several points when she was struck. My own conclusion from the proof is that the Pridgeon's course was much more to the eastward than was testified to by her wheelsman, when the Chamberlain's lights were sighted. The Chamberlain's course being N. by E., if the Pridgeon's course had been S. by E.—and I conclude it must have been at least as far to the eastward as that—the Chamberlain's lights would have shown over the starboard bow of the Pridgeon. It is true, Capt. Sherwood of the Pridgeon testified that he was on his course S. ½ W., when the Chamberlain's light was reported, and I doubt not he thought so, because he had given no order to change it; but he did not see the compass himself, and I conclude that his wheelsman had negligently allowed her to come up a point or two without any orders from the captain to do so. In other words, I conclude that the Pridgeon was running directly, or nearly so, into the wind, which was about S. S. E. The master of the Pridgeon says that, seeing at first only the white or mast-head light of the Chamberlain, he did not know it was a steamboat; that the first he saw was a bright light; and he says he did not know it was a boat at all. Here is his explanation of the situation and of his own conduct as given by himself:

"*Question.* What was the first thing you saw of the Chamberlain, or anything on her? *Answer.* I saw a bright light. I did not know whether it was the Chamberlain, or what it was. I saw a bright light before I knew it was a boat. *Q.* Did you get any report of that before you saw it? *A.* The lookout saw it about the same time I saw it. *Q.* Did he report it? *A.* Yes, about the same time. *Q.* Where did you see that light? *A.* About two points on our starboard bow,—about two points. *Q.* What did you do after seeing that light? *A.* I ordered the second mate to blow two blasts of the whistle. *Q.* What next? *A.* We waited a moment, and we got no reply. Then I ordered him to blow two more. When I ordered him to blow two more I ordered the wheel to starboard. Before the sound of the whistle died out, we got one blast. Then I stopped our boat, and reversed her."

· It appears to me this captain should have known this was a steamer's light. No craft, unless it had been a vessel at anchor, had a right to carry a bright light at the mast-head, and he must have known that he was outside of any anchorage ground; at all events, he had no right to continue going ahead until he had solved the question as to what that light meant. Had he stopped then, it seems to me almost certain that the collision would have been avoided; and, if in any degree in doubt as to what the bright light indicated, his plain duty was to stop. Instead, however, of stopping he starboarded his wheel, kept going ahead without slackening his speed, and, when within a brief time he saw the red light of the Chamberlain, he put his wheel hard a-starboard and gave signals to stop and reverse. But the engineer of the Pridgeon testifies that, although he responded promptly to the signal, he only had time to shut off, but had not reversed when the collision took place, while the proof shows clearly that the Pridgeon had responded to her hard a-starboard wheel, and was swinging rapidly to port, when she struck the Chamberlain. What seems to me, under the circumstances, to have been a very obvious fault on the part of the master of the Pridgeon was his starboarding instead of porting his wheel at the time he first saw this bright light; as it seems to me that the first thought which should occur to a prudent man under such circumstances would be to go to starboard, passing whatever craft the light belonged to port side to port side. He adopted the other alternative because he assumed that the craft carrying the bright light was to the starboard of him, when in fact the two steamers were approaching each other on converging lines,—the Pridgeon running some points east of south, and the Chamberlain going east by north,—and the two vessels were in the predicament provided for by article 19 of the new sailing rules:

"If two vessels under steam are crossing, so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way of the other."

He, having the craft, whatever it was, carrying this light, on his starboard side, was obliged to keep out of her way. This obligation he could have best fulfilled by stopping at once until he could decide in what manner he could most safely avoid the craft on his starboard side. He elected to starboard his wheel, when, it seems to me, from the proof, he should have ported; and went ahead, when, it seems to me, every instinct of caution should have prompted him to stop.

I come now to consider the faults charged by the answer against the Chamberlain:

*First.* That "the Chamberlain had not a proper and vigilant lookout." The proof shows that the Chamberlain had two lookouts, both men of experience, and stationed well forward, one on each side, and in what the seamen term "the eyes of the ship." This certainly would appear to be sufficient compliance with duty as to lookouts.

*Second.* "In not blowing fog-signals at proper intervals." The proof shows that fog-signals were regularly given on the Chamberlain from the time the fog set in,—an hour or an hour and a half before the collision. The master testified that he sounded the proper signals at inter-

vals of a minute or a minute and a half, from the time the fog set in; and his testimony is corroborated by all the others on the deck of the Chamberlain, and those on the Brown, and also by those in charge of the steamers Nahant and Palmer, that were running on about the same course as the Chamberlain, and at short distances to the east and astern of her. The only evidence that bears against the conclusion that the proper fog-signals were not given. is that they were not heard on the Pridgeon until after the Chamberlain's light was seen on the Pridgeon; and it is more reasonable, as it seems to me, to account for this failure to hear them on the ground of inattention on the part of the lookout of the Pridgeon than it is to say the signals were not given, in the face of the positive proof that they were given. Indeed, so many cases occur where fog horns or whistles are not heard, when the proof is clear that they were given, that the proof in this case that the fog-signals of the Chamberlain were not heard on the Pridgeon until after the Chamberlain's lights had been seen from the Pridgeon, should have but little weight as testimony to show they were not sounded. Scientific theories have been suggested of late to the effect that there are, at times, conditions of the atmosphere which make it acoustically opaque, and the time may come when these theories will be sufficiently established to make them safe guides in judicial proceedings, but at present I prefer to assume that signals shown to have been given were not heard because those whose duty it was to look and listen for them were inattentive to that duty.

*Third.* "That the Chamberlain was running at too high a rate of speed." I think the proof shows that both these steamers were running at a speed of about five miles an hour from the time the fog set in. The engineer of the Chamberlain says that was about his speed; and the engineer of the Pridgeon states that his wheel was making from 35 to 40 turns per minute, which, by the basis he gives for calculating his speed, would make the Pridgeon's speed just about five miles an hour, and I am not prepared to say from the proof that this was not a moderate rate of speed in a fog with some sea and wind.

*Fourth.* "That the Chamberlain was at fault in not answering the passing signals of the Pridgeon." The proof shows that, before these passing signals had been given by the Pridgeon to the effect that she would pass the Chamberlain starboard to starboard, the Chamberlain had given her signals indicating that she would pass port to port, and had shifted her wheel in order to do so with safety, and I do not think it was a fault on the part of the Chamberlain to keep to starboard under the circumstances; and this disposes of the fifth fault attributed to the Chamberlain, —that she ported when she should have starboarded.

The proof satisfies me that the Pridgeon's whistle was heard on the Chamberlain's port bow some time before the lookout on the Pridgeon first saw the Chamberlain's light, because I can see no reason why the light of the Pridgeon should not have been seen from the deck of the Chamberlain as soon as the Chamberlain's light was seen from the deck of the Pridgeon. As soon as the loud. short whistle from the Pridgeon was heard on the Chamberlain, of course all on the Chamberlain and on

the Brown, her tow, would have been on the alert to discover the Pridgeon's location and lights, but they did not see them until after the Chamberlain had blown one whistle to indicate her position, and that she would pass port to port, and had put her wheel to port, and had blown three blasts to indicate that she had a tow, and soon after that the lights of the Pridgeon were seen over the Chamberlain's port bow, and it was at this moment that the Pridgeon gave her two blasts as a passing signal. There was, however, an interval of time between the sighting of the Chamberlain's bright light and the time when her red light was seen on the Pridgeon, which, if it had been properly improved by the Pridgeon in stopping and backing, would, as it seems to me, have prevented the collision.

After a careful and laborious examination of the proof I am unable to attribute any special fault to the Chamberlain. She was on her regular course; she had had no occasion to deviate from her course. It is true, her wheelsman might have become careless, and allowed her to swing by a point or so from her chart course. Those in charge of her heard the Pridgeon's short, clear, single whistle blast on her port bow, and, taking it for granted that it meant a steamer bound up the lake on their port side, they replied with one blast, which indicated that they would pass port to port, but, to be entirely safe, the master of the Chamberlain ported a quarter of a point, giving the signal that he had done so; then the lights of the Pridgeon were seen crossing his bow, but it was then too late to attempt, much less to accomplish, any maneuver to escape the peril. It is asked by the proctors for the Pridgeon, why did not the Chamberlain stop, and why was it not their duty to stop, when they heard the Pridgeon's whistle on their port bow? The reply seems to me a natural and sufficient one. They assumed that the Pridgeon was bound up the lake, and that they would pass port to port, and gave their signals accordingly. Nothing that is disclosed in the proof shows that there was any intimation to those in charge of the Chamberlain that any other maneuver was required of them, and hence there seems to me to have been no duty to have adopted any other expedient.

Much space and time have been spent in discussing the question as to the time that this collision occurred. The question is only material as it may bear upon the speed of the two ships at the time they sighted each other; and I find no difficulty in determining from the proof that both steamers were running at the rate of five miles per hour when they became aware of each other's proximity. I have no doubt from the proof that the Chamberlain got under way outside of Milwaukee harbor with her tow soon after two o'clock; that her speed from the time she got under way was from 9 to 9½ miles per hour, which, in the 5 hours intervening before 7 o'clock,—the time when the fog set in,—would carry her about 45 miles. She had thus run under check at a speed of 5 miles an hour, for, say, an hour and a half, or until about half past 8,—the time at which I conclude from the proof the collision occurred, —which would carry her abreast of, or a little below, the entrance to Sheboygan harbor, just about the point where the collision occurred.

My conclusion is that there was either a careless or an incompetent lookout kept upon the Pridgeon, by reason of which the fog signals given from the Chamberlain were not heard on the Pridgeon,, because the proof shows that the steam-propellers Palmer and Nahant also left Milwaukee about the same time with the Chamberlain. They took courses parallel with the course of the Chamberlain, but a little outside of her, still within sight and hearing, and these two vessels were in sight of the Chamberlain up to the time the fog set in thick, although the Chamberlain had passed them both, and was a little inside of, as well as ahead of, them. Different estimates are given as to the distance of the Palmer, which held an outside course from the Chamberlain at the time of the collision, and for a short time previous to it, but probably she was not to exceed four miles away from the Chamberlain, and the Nahant was between the Chamberlain and the Palmer; and all the testimony from the decks of the Palmer and the Nahant, and from the decks of the Chamberlain and the Brown, agrees that these three steamers heard each other's fog-signals right along up to the time of the collision, although, the wind being south-easterly, it would have interfered to some extent with the transmission of the sound from the Palmer and Nahant to the Chamberlain. The Pridgeon, approaching the Chamberlain with the wind in her favor, ought certainly to have heard the Chamberlain's fog-signals, if they were given; and it seems to me there is no other conclusion than that the reason why they did not hear them was because proper attention was not paid. I therefore find that the collision occurred by reason of the fault of those in charge of the navigation of the Pridgeon, and that the libelants are entitled to recover the damages.